## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **INSURED AIRCRAFT TITLE SERVICE, LLC, a Delaware limited liability company,** )<br>)<br>)<br>) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. CIV-20-742-G** |
| **COMFORT JET AVIATION, LTD. et al.,** )<br>)<br>) | |
| **Defendants,** ) | |
| **and** ) | |
| **KENT LUBRICATION CENTERS, LTD.,** )<br>)<br>) | |
| **Third-Party Defendant.** ) | |

### OPINION AND ORDER

Now before the Court is Defendant Dassault Falcon Jet-Wilmington Corp.'s ("DFJ-W") Motion for Summary Judgment Against Defendant Comfort Jet Aviation, Ltd. ("CJA") (Doc. No. 263). CJA responded in opposition (Doc. No. 278). DFJ-W replied in further support of its Motion (Doc. No. 284).

This lawsuit, initiated as an interpleader action by Plaintiff Insured Aircraft Title Service, LLC ("IATS"), involves numerous claims by and among several Defendants relating to the sale of a 1987 Dassault Falcon 900 aircraft (the "Aircraft"). In 2018, CJA agreed to sell the Aircraft to Defendant Kent Aviation, LLC ("Kent Aviation") pursuant to a purchase agreement. In anticipation of the sale of the Aircraft, CJA engaged DFJ-W to

perform a "C-Check" inspection of the Aircraft and to perform associated maintenance and repairs.

DFJ-W moves for summary judgment on its two cross-claims against CJA for breach of contract and on CJA's cross-claims against DFJ-W for breach of contract and unjust enrichment.  *See* DFJ-W Cross-Cls. (Doc. No. 10) ¶¶ 50-52, 53-56; CJA Cross-Cls. (Doc. No. 61) ¶¶ 43-51.

I.   SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim.  The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury.  *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B).  While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

When the moving party has the burden of proof at trial, "a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  The moving party cannot carry its burden by "pointing to parts of the record that [the movant] believes illustrate the absence of a genuine issue of material fact." *Id.*  Rather, to obtain summary judgment on its own claim or defense, a movant "must establish, as a matter of law, all essential elements of the issue before the nonmovant can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*  Thus, if a party who would bear the burden of persuasion at trial lacks sufficient evidence on an essential element of a claim or defense, all other factual issues concerning the claim or defense become immaterial.  *See Celotex*, 477 U.S. at 322; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

II.    UNDISPUTED MATERIAL FACTS[1]

   A.  *The Aircraft Work Proposal and Agreement*

In August 2018, CJA retained DFJ-W to perform a "C-Check" on the Aircraft pursuant to an Aircraft Work Proposal and Agreement ("C-Check Agt."), dated August 15, 2018.  *See* Ex. 1, C-Check Agt. (Doc. No. 263-1).[2]  The C-Check Agreement is identified as "PROPOSAL NCQ18-00542, Rev: 2."  *Id.* at 1.  A C-Check is a comprehensive inspection that also includes diagnosing any problems, known as "discrepancies," and performing repairs.  Ex. 2, McDevitt Aff. (Doc. No. 263-2) at 2.

CJA retained Aeromanagement Inc. ("Aeromanagement"),[3] and specifically Aeromanagement's president, Ennio Staffini, to serve as CJA's representative and monitor the C-Check inspection and any associated discrepancy repairs.  *See* Ex. 4, Staffini Aff. at 2.  Mr. Staffini was responsible for reviewing and approving DFJ-W's invoices for work performed on the Aircraft on behalf of CJA.  *See id.*; Ex. 5, Staffini Dep. (Doc. No. 263-5) at 290:5-291:17.  The cover page of the C-Check Agreement lists Ennio Staffini as the representative for CJA.  *See* Ex. 1, C-Check Agt. at 1.

The second page of the C-Check Agreement contains a "Pricing Summary" and states that "[s]ummary prices are subject to change depending upon your acceptance of

---

[1] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to CJA as the nonmovant.

[2] All exhibit references refer to the Exhibits submitted by DFJ-W with its Motion (Doc. No. 263), unless stated otherwise.

[3] CJA had previously retained Aeromanagement to list and market the Aircraft for sale in July 2018.  Ex. 4, Staffini Aff. (Doc. No. 263-4) at 2.

individual line items within the work scope and agreed to in writing." *Id.* at 2.  The Pricing Summary identifies a total charge of $142,040, all of which is categorized as the "Airframe" price subtotal.  *See id.*  The Pricing Summary excludes "all work scope items identified as Optional Item or *As Required* on the [C-Check Agreement]." *Id.*  There do not appear to be any "Optional Items" identified in the C-Check Agreement.

Within the $142,040 "Airframe" subtotal, the C-Check Agreement sets forth the charges by line item.  *See id.* at 5-8 (line items 1.1 through 1.19).  Line items 1.4 through 1.19 each identify a specific task and specify the dollar amount charged for "Labor" for that task.  For "Material" and "Services," the amount is stated to be "As required." *Id.*[4]

Section IV of the C-Check Agreement is titled "Change Orders."  *Id.* at 10.  This section provides, in relevant part, that "[a]ny change or additional work will be documented on a DAS Work Proposal & Agreement (WPA), which must be approved by the customer before making changes to the work."  *Id.*

Section VI of the C-Check Agreement is titled "Maintenance Conditions."  *Id.* Section VI.2 provides as follows:

> Any discrepancies, corrosion repair, or other maintenance found as a result of the work scope will be worked on a firm fixed price or time and materials basis.  Both require prior customer approval and could impact the downtime of the aircraft.  Corrosion and aircraft repairs beyond Aircraft Maintenance Manual (AMM) or Structural Repair Manual (SRM) may require additional downtime due to engineering and material procurement.

---

[4] The only other line-item charge is for the category "Other Miscellaneous Charges," with a subtotal of $0.  *See* Ex. 1, C-Check Agt. at 9.  This category identifies two charges, one for Miscellaneous Materials Charges and one for Miscellaneous Environmental Charges, each of which is capped at $2500.  *See id.*

*Id.*

   B.  *The Aircraft Purchase Agreement and the Escrow and Hold Back Agreement*

   Prior to work beginning on the C-Check, CJA entered into an agreement to sell the Aircraft to Kent Aviation for $2,500,000, pursuant to an Aircraft Purchase Agreement ("APA") dated September 21, 2018.  *See* Ex. 3, APA (Doc. No. 263-3).  CJA is defined as the Seller and Kent Aviation as the Purchaser.  *See id.* at 1.  Section 3.2 of the APA provides that "[t]he Aircraft shall be delivered to Purchaser with a 1C Check,[5] including all other items due up to, and including, the date of delivery, further described in <u>Exhibit E</u> (the 'Maintenance').  The Maintenance shall be completed by DAS, in Wilmington, Delaware (the 'Maintenance Facility')."  *Id.* at 4.  Exhibit E to the APA is titled "Maintenance Work Scope" and states, "Refer to Dassault Aviation Services Quote No. NCQ18-00542 Rev 2 dated August 15, 2018."  *Id.* at 16.[6]

   Section 4.1 of the APA is titled "Closing Date" and provides that "[t]he Closing and delivery of title to the Aircraft to Purchaser shall take place on or before three (3) Business Days from and after the completion by the Maintenance Facility of all Maintenance as required pursuant to Section 3.1, 3.2, and 3.3 above (the 'Closing Date')."  *Id.* at 5.

   Notwithstanding the APA's requirement that the Aircraft be delivered to Kent Aviation with a completed C-Check, CJA and Kent Aviation decided by January 2019 to close the Aircraft sale transaction prior to the completion of that inspection.  *See* Ex. 4,

---

[5] The parties and agreements refer to "C-Check" and "1C-Check" interchangeably.

[6] The parties agree that "DAS" and "Dassault Aviation Services" in the APA and other agreements refer to DFJ-W.  *See* Mot. at 2.

Staffini Aff. at 4. To that end, CJA, Kent Aviation, IATS, and Aeromanagement entered an Escrow and Hold Back Agreement, dated January 25, 2019. *See* Ex. 8, Escrow and Hold Back Agt. (Doc. No. 263-8). The Escrow and Hold Back Agreement defines CJA as Seller, Kent Aviation as Purchaser, and IATS as Escrow Agent, and it describes Aeromanagement as a service provider for CJA and as CJA's trustee for the purpose of registration in the United States. *See id.* at 1.

As relevant here, CJA and Kent Aviation agreed in the Escrow and Hold Back Agreement to set aside $1,500,000 of the $2,500,000 purchase amount for the Aircraft as a "hold back" to pay DFJ-W for completion of the C-Check and associated maintenance. *See id.* at 2. Specifically, section 1.2 of the Escrow and Hold Back Agreement provides as follows:

> [CJA], Aeromanagement and [Kent Aviation] hereby agree to close on or about January 31, 2019 and to leave the amount of United States $1,500,000 as a hold-back amount (the "*Hold Back Amount*") that shall be used to either pay all invoices as issued periodically by DAS and sent by Aeromanagement in the name of [CJA] in relation to the work package number 01-46370 or to guarantee final payment and issuance of the final aircraft release documents. The Parties agree and understand that the Escrow Agent shall, upon receipt of the invoice or invoices from Aeromanagement, pay automatically and irrevocably each invoice without further authorization by the Parties. . . . . It is furthermore agreed and understood that [CJA] shall be responsible for all costs that may exceed the Hold Back Amount and shall diligently and promptly pay DAS any balance left over, if any.

*Id.*

Section 3 of the Escrow and Hold Back Agreement provides as follows:

(i)     The Parties irrevocably agree that after closing and during the period that the Escrow Agent holds the Hold Back Amount the following mechanics shall occur as follows:

7

    (ii)      Aeromanagement shall send to the Escrow Agent all invoices as issued by DAS after [CJA]'s approval with copy to [Kent Aviation], and

    (iii)    Intentionally left blank

    (iv)    The Escrow Agent shall promptly, and without further authorization by any of the Parties, pay the invoices as received and shall advise all Parties as well as DAS when the wires have been completed, and

    (v)     The Escrow Agent shall advise all Parties when DAS' final invoice has been paid, and shall, without further authorization by any of the Parties, wire transfer any remining amount to [CJA], and

    (vi)    The Escrow Agent shall, upon having disbursed the entire Hold Back Amount, declare the escrow closed.

*Id.* at 3.

CJA and Kent Aviation closed the transaction for the sale of the Aircraft on February 6, 2019. *See* Ex. 4, Staffini Aff. at 4.

### C. DFJ-W C-Check and Aircraft Maintenance

On November 13, 2018, the Aircraft was flown from its base location in Togo, Africa, to DFJ-W's maintenance facility in Delaware. *See* DFJ-W Ex. 2, McDevitt Aff. at 2. The following day, on November 14, 2018, Mr. Staffini signed an Aircraft Work Authorization (or "AWA") on CJA's behalf. *See* Ex. 14, AWA (Doc. No. 263-14). The Aircraft Work Authorization identifies the Aircraft, references "Work Order Number 01-46370," and includes the following authorization: "I hereby authorize DAS to perform the work and services identified on the Work Order referenced above. I agree that the work will be performed in accordance with the information provided on such Work Order and

the Terms and Conditions on the following page." *Id.* at 1.[7]   The Aircraft Work

Authorization does not contain any substantive information about the scope of work or cost

estimates. *See id.*

For any repair resulting from the C-Check inspection, DFJ-W provides a "squawk"

to the customer explaining the discrepancy discovered and the next steps for resolution of

the discrepancy.  Ex. 6, Dishman Aff. (Doc. No. 263-6) at 2.  DFJ-W sent invoices for

repairs to the Aircraft to Mr. Staffini.  *See id.*  DFJ-W states generally that CJA, through

Mr. Staffini, approved repairs and invoices issued by DFJ-W.  *See id.*  DFJ-W does not

attach to its Motion any squawk documentation, any invoices, or any exhibits or testimony

reflecting specific approvals by Mr. Staffini or otherwise by CJA for any repairs or

invoices.

CJA admits that Mr. Staffini received and approved certain invoices from DFJ-W

on behalf of CJA.  *See* CJA Resp. (Doc. No. 278) at 8.  CJA, however, disputes that DFJ-

W timely provided all squawks for repairs to the Aircraft resulting from the C-Check and

disputes that DFJ-W fully disclosed all discovered issues and estimated costs for repair.

*See id.*

In January 2019, DFJ-W determined that there was significant corrosion on the

Aircraft.  Ex. 4, Staffini Aff. at 4.  On January 10, 2019, DFJ-W Project Manager Cleveland

Turner advised Mr. Staffini that the wings of the Aircraft would need to be removed to

---

[7] The term "Work Order" is not otherwise defined, and it is unclear if this refers to a
separate document.  There does not appear to be a separate "Work Order" document in the
record before the Court, and DFJ-W does not cite to or discuss a "Work Order" document.

inspect for corrosion.  *Id.*  Mr. Staffini states that he informed his contact at CJA, Hervé Dossou, the same day (January 10, 2019) about the removal of the wings of the Aircraft. *See id.*  DFJ-W generated a repair estimate for the removal of the wings and repair of known corrosion (the "Corrosion Estimate").  *See* Ex. 7, Corrosion Estimate (Doc. No. 263-7).  The Corrosion Estimate, which is not dated,[8] states an estimated cost of repair, including engineering, labor, and materials, of $1,304,720.  *See id.* at 2.  There is no evidence in the present record to reflect that Mr. Staffini or CJA approved the wing removal and corrosion repair outlined in the Corrosion Estimate.

After the sale transaction closing on February 6, 2019, Mr. Staffini submitted "several" DFJ-W invoices to the Escrow Agent pursuant to the Escrow and Hold Back Agreement for payment to DFJ-W from the hold back funds.  *See* Ex. 4, Staffini Aff. at 5. The present record does not reflect which DFJ-W invoices were submitted by Mr. Staffini, the content of those invoices, the amount billed, or the dates of submission.

CJA attaches to its Response three DFJ-W invoices.  *See* CJA Exs. 4 (Doc. No. 278-4), 5 (Doc. No. 278-5), 7 (Doc. No. 278-7).  It is unclear from the present record if any of these three documents represent final versions of the invoices, whether these documents were submitted to Mr. Staffini for payment, or whether Mr. Staffini submitted any of these three documents to the Escrow Agent.

The first invoice is titled "Proforma Invoice" and consists of 123 pages.  *See* CJA Ex. 4.  Every page of this document bears a watermark stating "work in process not a final

---

[8] DFJ-W states without citation to supporting evidence that it provided the Corrosion Estimate to CJA on January 31, 2019.  *See* Mot. at 3-4.

invoice." *See id.*  The invoice has a blank field for "Invoice date" but bears a footer stating that it was printed on January 23, 2019. *See id.* at 1.  The cover page of the invoice contains the following billing summary:

| | Time & Materials | Flat Rate | Total |
|---|---|---|---|
| Labor: | $20,804.30 | $376,662.00 | $397,466.30 |
| Parts: | $352,267.29 | $0.00 | $352,267.29 |
| Services: | $152,465.17 | $4,860.81 | $157,325.98 |
| Subtotal: | $525,536.76 | $381,522.81 | $907,059.57 |
| Freight: | | | $2,673.76 |
| Work Order Fees: | Miscellaneous Materials | $2,500.00 | |
| | Miscellaneous Environmental | $2,500.00 | $5,000.00 |
| Total before Progress Billings: | | | $914,733.33 |
| Progress Billing: | | | -$331,861.00 |
| **Total:** | | | **$582,872.33** |

*Id.*

The second invoice is titled "Proforma Invoice" and consists of 163 pages. *See* CJA Ex. 5.  The invoice has a blank field for "Invoice date," but its footer states that it was printed on February 8, 2019. *See id.* at 1.  The cover page contains the following billing summary:

| | Time & Materials | Flat Rate | Total |
|---|---|---|---|
| Labor: | $149,084.37 | $584,985.00 | $734,069.37 |
| Parts: | $417,477.08 | $68,206.00 | $485,683.08 |
| Services: | $173,059.76 | $21,860.81 | $194,920.57 |
| Subtotal: | $739,621.21 | $675,051.81 | $1,414,673.02 |
| Freight: | | | $5,416.85 |
| Work Order Fees: | Miscellaneous Materials | $2,500.00 | |
| | Miscellaneous Environmental | $2,500.00 | $5,000.00 |
| Total before Progress Billings: | | | $1,425,089.87 |
| Progress Billing: | | | -$631,861.00 |
| **Total:** | | | **$793,228.87** |

*Id.*

The third invoice is titled "Proforma Invoice" and consists of 310 pages.  *See* CJA

Ex. 7.  Each page bears a watermark stating "work in process not a final invoice."  *See id.*

The invoice has a blank field for "Invoice date" but a footer stating that it was printed on

August 23, 2019.  *See id.* at 1.  The cover page contains the following billing summary:

| | Time & Materials | Flat Rate | Total |
|---|---|---|---|
| Labor: | $114,880.33 | $1,142,188.30 | $1,257,068.63 |
| Parts: | $567,429.28 | $271,366.15 | $838,795.43 |
| Services: | $336,940.39 | $155,924.54 | $492,864.93 |
| Misc Charges: | $280.00 | --- | $280.00 |
| **Subtotal:** | **$1,019,530.00** | **$1,569,478.99** | **$2,589,008.99** |
| Freight: | | | $16,295.31 |
| Work Order Fees: | Miscellaneous Materials | $2,500.00 | |
| | Miscellaneous Environmental | $2,500.00 | $5,000.00 |
| **Total before Progress Billings:** | | | $2,610,304.30 |
| Progress Billing: | | | -$1,311,861.00 |
| **Total:** | | | **$1,298,443.30** |

*Id.*

By approximately August 2019, a dispute arose between CJA and DFJ-W regarding

the scope and cost of the ongoing maintenance work on the Aircraft.  Ex. 4, Staffini Aff.

at 5; *see also* Exs. 9 (Doc. No. 263-9), 10 (Doc. No. 163-10).  Around that same time, CJA

revoked Mr. Staffini's authorization to approve any additional repairs by or payments to

DFJ-W.  *See* Ex. 4, Staffini Aff. at 5.  CJA halted the repair project, and the escrow agent

made no further payments to DFJ-W under the Escrow and Hold Back Agreement.  *See id.*

DFJ-W then ceased repair work on the Aircraft.  *See id.*; Ex. 2, McDevitt Aff. at 2.  The

Aircraft remains presently in storage at DFJ-W's maintenance facility in Delaware.  Ex. 2,

McDevitt Aff. at 2.  At the time the Aircraft repair project was halted, there was $520,000

in hold back funds remaining in the custody of the escrow agent.[9]  *See* Ex. 4, Staffini Aff. at 5.

According to DFJ-W, the "current job cost total" owed by CJA to DFJ-W is $2,463,816.37.  Ex. 6, Dishman Aff. at 2-3.  DFJ-W has received $1,311,861 in payments from CJA for work performed on the Aircraft.  *Id.* This payment total includes three payments disbursed by the Escrow Agent from the Hold Back Amount, totaling $980,000. *Id.*  CJA disputes that it owes DFJ-W any additional money for work performed on the Aircraft.  *See* CJA Resp. at 12-13.

III.  DISCUSSION

A.  *DFJ-W's Breach of Contract Claims*

1.  *Breach of Contract for Nonpayment*

DFJ-W moves for summary judgment on its claim against CJA for breach of contract for nonpayment.  *See* Mot. at 8-9.  Specifically, DFJ-W argues that "[CJA], through its agent Staffini, authorized work that DFJ-W performed" and that "[CJA] breached its contract to pay for work it authorized." *Id.*

As a threshold matter, DFJ-W fails to direct the Court to the specific agreement underlying its breach claim or discuss any specific contractual obligations.  It is therefore unclear if there is an appliable choice-of-law provision governing DFJ-W's breach claim.

---

[9] IATS interpleaded $516,000 in remaining hold back funds into the Court's registry, retaining $4000 for payment of its attorney's fees upon its discharge from this litigation. *See* Order of Apr. 8, 2021 (Doc. No. 59).

"When exercising diversity jurisdiction under 28 U.S.C. § 1332, a district court ordinarily applies the choice-of-law rules of the State in which it sits." *Gerson v. Logan River Acad.*, 20 F.4th 1263, 1270 (10th Cir. 2021). Oklahoma's "established general choice-of-law rule for contract actions is bottomed on the terms of 15 O.S. § 162." *Bernal v. Charter Cnty. Mut. Ins. Co.*, 209 P.3d 309, 311 (Okla. 2009). Title 15, section 162 of the Oklahoma Statutes prescribes that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Okla. Stat. tit. 15, § 162. Accordingly, "the rule of *lex loci solutionis*—the law where the relevant contract performance occurs—is to be applied." *Bernal*, 209 P.3d at 311.

DFJ-W states, without discussion or citation to legal authority, that "the substantive law of Oklahoma applies." Mot. at 8 n.1. But application of Oklahoma's choice-of-law rules does not support that conclusion: DFJ-W does not argue that any work was performed in Oklahoma or that any agreement for work on the Aircraft was formed in Oklahoma.[10]

It is apparent that DFJ-W is asserting a breach claim for alleged nonpayment of work DFJ-W performed on the Aircraft at its Delaware maintenance facility. The Court therefore finds that Delaware substantive law applies to DFJ-W's claim of breach for nonpayment. *See Bernal*, 209 P.3d at 311. Under Delaware law, the elements of a claim

---

[10] DFJ-W points to the "Applicable Law" provision in the November 14, 2018 Aircraft Work Authorization ("AWA"), which states that "[t]his Agreement shall be interpreted in accordance with the laws of the state in which the services were performed." *See* Mot. at 8 n.1; Ex. 14, AWA at 3 (section 19). It is not clear that this provision applies to an agreement that is the subject of DFJ-W's claim of breach. In any event, the choice-of-law provision in the AWA is consistent with Oklahoma's choice-of-law rules.

for breach of contract are: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs." *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011).[11]

The agreement in the record that sets forth a contractual undertaking by the parties relating to the C-Check and associated repairs is the C-Check Agreement.[12] *See* Ex. 1, C-Check Agt. The C-Check Agreement lists a $142,040 charge for labor but identifies no other specific prices for the C-Check or for associated maintenance or repairs. DFJ-W, however, claims that CJA owes a total of $2,463,816.37 as of the time the Aircraft repair project was halted in August 2019. It is not apparent how this total was reached under the terms of the C-Check Agreement, and DFJ-W makes no attempt to show, through competent evidence, how CJA owes $2,463,816.37. The Court observes, for example, that DFJ-W's August 23, 2019 invoice lists a total labor cost of $1,257,068.63,[13] which greatly exceeds the labor cost listed in the C-Check Agreement. Further, even observing that certain pricing categories in the C-Check Agreement were not fixed at the time the C-Check Agreement was executed—in particular, for materials and services costs—DFJ-W fails to explain with any specificity what additional costs were incurred during the repair

---

[11] The elements for a breach of contract claim are substantially similar under Oklahoma law. *See Morgan v. State Farm Mut. Auto. Ins. Co.*, 488 P.3d 743, 748-49 (Okla. 2021).

[12] Upon review, the Court does not discern a choice-of-law provision in the C-Check Agreement, and the parties do not reference one in their papers.

[13] It is unclear if the August 23, 2019 invoice, attached by CJA, is a final version submitted by DFJ-W to CJA for payment. This is the only exhibit in the record showing the approximate status of billing around the time the repair project was halted, however. The August 23, 2019 invoice lists a total of $2,610,304.30, whereas DFJ-W is claiming a total of $2,463,816.37.

project and why CJA is obligated to pay those costs under the terms of the C-Check Agreement.  Likewise, DFJ-W does not offer evidentiary material showing specific approvals by Mr. Staffini (or anyone else associated with CJA) of specific repairs or costs above those itemized in the C-Check Agreement.[14]

DFJ-W attaches to its Motion the Corrosion Estimate, which DFJ-W asserts it provided to CJA in January 2019, that outlines $1,304,720 in costs for engineering, labor, and materials for removal of the wings of the Aircraft and repair of corrosion.  *See* Ex. 7, Corrosion Estimate at 2.  There is no showing in the record that Mr. Staffini or CJA approved the additional costs in the Corrosion Estimate,[15] however, and it is unclear whether these additional costs relate to the C-Check project under the C-Check Agreement or whether the Corrosion Estimate represents a different project separate from the scope of the C-Check.  DFJ-W does not discuss the Corrosion Estimate in its argument or present any meaningful advocacy for how the Court should interpret this document in the context of its breach of contract claim.

DFJ-W, as the movant on its claim for breach, has the burden to prove all essential elements of its claim.  *See Pelt*, 539 F.3d at 1280.  While it is undisputed that DFJ-W and CJA entered into a valid agreement—the C-Check Agreement —to perform a C-Check and

---

[14] To the extent that DFJ-W points to the November 14, 2018 AWA as an authorization of work by Mr. Staffini on behalf of CJA, DFJ-W has not shown that such authorization in any way expands on the work authorized in the C-Check Agreement itself.

[15] CJA disputes that it agreed to the additional costs outlined in the Corrosion Estimate. *See* CJA Resp. at 10; *see also* Ex. 1, C-Check Agt. at 10 ("Any discrepancies, corrosion repair, or other maintenance found as a result of the work scope will be worked on a firm fixed price or time and materials basis.  Both require prior customer approval and could impact the downtime of the aircraft.").

associated repairs, wholly missing from the record is any evidence demonstrating that CJA failed to pay amounts owed under the C-Check Agreement or that CJA was bound by another valid agreement with CJA to pay repair costs and failed to pay amounts owed under that agreement.  In other words, to establish breach on summary judgment, DFJ-W must establish that based on the undisputed material facts CJA was obligated by contract to pay more than the $1,311,861 it undisputedly paid and failed to do so.  The Court concludes that DFJ-W has failed to meet its burden.  Accordingly, DFJ-W's motion for summary judgment on its claim against CJA for breach of contract for nonpayment is DENIED.

### 2.  Breach of the Escrow and Hold Back Agreement

DFJ-W also moves for summary judgment on its claim against CJA for breach of the Escrow and Hold Back Agreement.  *See* Mot. at 9-12.  DFJ-W is not a party to the Escrow and Hold Back Agreement, but DFJ-W argues that it is has standing to assert a breach claim as a third-party beneficiary of the agreement.  *See id.* at 11.

The Escrow and Hold Back Agreement contains an express choice-of-law provision stating that "[t]his Escrow and Hold Back Agreement shall be construed and enforced in accordance with, and the rights of the Parties hereto shall be governed by, the laws of the State of Oklahoma."  Ex. 8, Escrow and Hold Back Agt. at 5 (section 9).  "Oklahoma recognizes parties' selection of a particular state's law to control a contract agreement as long as the selected law is not contrary to Oklahoma's established public policy."  *SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 972-73 (N.D. Okla. 2017) (citing *Dean Witter Reynolds, Inc. v. Shear*, 796 P.2d 296, 299 n.12 (Okla. 1990)).

Under Oklahoma law, "[t]he elements of a breach of contract action are: (1) formation of a contract; (2) breach of the contract; and (3) damages as a result of that breach." *Morgan*, 488 P.3d at 748. Title 15, section 29 of the Oklahoma Statutes prescribes that "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Okla. Stat. tit. 15, § 29. "It is not necessary that the party be specifically named as a beneficiary but only that the contract be made expressly for the benefit of a third person and 'expressly' simply means in an express manner; in direct or unmistakeable terms; explicitly; definitely; directly." *Keel v. Titan Constr. Corp.*, 639 P.2d 1228, 1231 (Okla. 1981) (internal quotation marks omitted); *see also Colony Ins. v. Burke*, 698 F.3d 1222, 1230 (10th Cir. 2012).

Upon review of the Escrow and Hold Back Agreement, the Court finds that DFJ-W may enforce the terms of the Escrow and Hold Back Agreement as a third-party beneficiary. The Escrow and Hold Back Agreement expressly references DFJ-W and provides a mechanism for payment of DFJ-W invoices after the closing of the transaction. *See* Ex. 8, Escrow and Hold Back Agt. at 2. Under the Escrow and Hold Back Agreement, CJA and Kent Aviation agreed to set aside $1,500,000 of the purchase amount for the Aircraft to be "used to either pay all invoices as issued periodically by DAS and sent by Aeromanagement in the name of [CJA] in relation to the work package number 01-46370 or to guarantee final payment and issuance of the final aircraft release documents." *Id.* Section 3 of the Escrow and Hold Back Agreement set forth "mechanics" for payments, prescribing first that "Aeromanagement shall send to the Escrow Agent all invoices issued by [DFJ-W] after [CJA]'s approval with copy to [Kent Aviation]" and then second that

18

"[t]he Escrow Agent shall promptly, and without further authorization by any of the Parties, pay the invoices as received." *Id.* at 3.  The Court concludes that the Escrow and Hold Back Agreement expressly provided a benefit to DFJ-W, which that entity may enforce pursuant to title 15, section 29 of the Oklahoma Statutes.

DFJ-W argues that it is entitled to the remainder of the interpleaded hold back funds, but DFJ-W does not attempt to establish compliance with the specific mechanism in the Escrow and Hold Back Agreement for payment to DFJ-W.  While it is undisputed that the escrow agent made three payments to DFJ-W from the Hold Back Amount totaling $980,000, DFJ-W does not show that it is entitled to any of the rest of those funds.  DFJ-W does not attach any final invoices for payment to its Motion or otherwise provide any information about the work performed and amounts billed.[16]  Nor does the record reflect that additional specific invoices were submitted to the escrow agent for payment, by Aeromanagement or any other party, as required by the Escrow and Hold Back Agreement.

DFJ-W argues that CJA breached the Escrow and Hold Back Agreement by "preventing" disbursement of Hold Back funds by the escrow agent.  Mot. at 9.  The Court finds no basis in the record to conclude that CJA improperly interfered with the payment procedure in the Escrow and Hold Back Agreement.  At most, the record reflects that CJA ceased approving further invoices for payment at some point in August 2019 when a conflict arose between DFJ-W and CJA as to the amounts billed by DFJ-W.  It is not clear

---

[16] The Court cannot rely here on the three pro forma invoices attached by CJA to its Response, as the record does not establish that these documents are final invoices issued by DFJ-W and delivered to Aeromanagement or CJA for payment.  They instead appear to be draft documents produced in discovery from the files of DFJ-W.

that a decision not to approve an invoice issued by DFJ-W constitutes a breach of any obligation the Escrow and Hold Back Agreement, as DFJ-W appears to concede that CJA's approval was required to trigger the escrow agent's payment obligation.  *See* Mot. at 10 (citing section 3(ii) of the Escrow and Hold Back Agreement and stating that this provision "provides that that Aero[management] should send the invoices to IATS after Comfort's approval").  Given the absence of any final invoices submitted to Aeromanagement (or CJA) for approval in the record, moreover, the Court cannot properly conclude that CJA may have violated any express or implied duty by withholding approval.

In accordance with the foregoing, the Court concludes that DFJ-W has failed to establish all the elements of its breach claim as a matter of law.  DFJ-W has failed to establish that based on the undisputed material facts DFJ-W was entitled to receive more than the $980,000 it had already received from the hold back funds or that CJA violated any contractual duty under the Escrow and Hold Back Agreement.  Accordingly, DFJ-W's motion for summary judgment on its claim for breach of the Escrow and Hold Back Agreement is DENIED.

### B.  CJA's Claims

DFJ-W moves for summary judgment on CJA's claims for breach of contract and unjust enrichment.  *See* Mot. at 12-13.  DFJ-W, however, does not discuss the elements of either claim or present any meaningful discussion for why it is entitled to summary judgment based on the factual record.  This nominal argument is insufficient to meet DFJ-W's burden.  *See Celotex*, 477 U.S. at 322 (1986) ("[A] party seeking summary judgment

always bears the initial responsibility of informing the district court of the basis for its motion . . . .").  Accordingly, DFJ-W's motion is DENIED as to CJA's claims.

CONCLUSION

As outlined above, Defendant Dassault Falcon Jet-Wilmington Corp.'s Motion for Summary Judgment Against Defendant Comfort Jet Aviation, Ltd. (Doc. No. 263) is DENIED.

IT IS SO ORDERED this 12th day of June, 2023.

CHARLES B. GOODWIN
United States District Judge