# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **INSURED AIRCRAFT TITLE SERVICE, LLC, a Delaware limited liability company,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. CIV-20-742-G** |
| **COMFORT JET AVIATION, LTD. et al.,** | ) ) ) | |
| **Defendants,** | ) ) | |
| **and** | ) ) | |
| **KENT LUBRICATION CENTERS, LTD.,** | ) ) ) | |
| **Third-Party Defendant.** | ) ) | |

## <u>OPINION AND ORDER</u>

Now before the Court is Defendant Dassault Falcon Jet-Wilmington Corp.'s ("DFJ-W") Motion for Summary Judgment on claims asserted by Defendant Kent Aviation, LLC ("Kent Aviation") (Doc. No. 264). Kent Aviation responded in opposition (Doc. No. 282), and DFJ-W replied in further support of its Motion (Doc. No. 287).

This lawsuit, initiated as an interpleader action by Plaintiff Insured Aircraft Title Service, LLC ("IATS"), involves numerous claims by and among several Defendants relating to the sale of a 1987 Dassault Falcon 900 aircraft (the "Aircraft"). In 2018, Comfort Jet Aviation, Ltd. ("CJA") agreed to sell the Aircraft to Kent Aviation pursuant to a purchase agreement. In anticipation of the sale of the Aircraft, CJA engaged DFJ-W

to perform a "C-Check" inspection of the Aircraft and to perform associated maintenance and repairs.

Relevant to the instant Motion, Kent Aviation asserts cross-claims against DFJ-W for breach of contract, tortious interference with contract, fraud by nondisclosure, negligence, and negligence per se. *See* Kent Aviation Am. Cross-Cls. (Doc. No. 63) at 25-31, 35-36.[1] DFJ-W moves for summary judgment on these cross-claims asserted by Kent Aviation and requests an award of attorney's fees.

I.   SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine

---

[1] Kent Aviation also asserted cross-claims for breach of an alleged oral agreement and civil conspiracy. Kent Aviation now represents that it is withdrawing these claims, *see* Resp. at 31, 49 n.4, and they therefore are deemed withdrawn. The Court has dismissed Kent Aviation's cross-claim for *res ipsa loquitor* by separate order.

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B).  While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

## II.   UNDISPUTED MATERIAL FACTS[2]

### A.  *The C-Check Agreement*

In August 2018, CJA retained DFJ-W to perform a "C-Check" on the Aircraft pursuant to an Aircraft Work Proposal and Agreement ("C-Check Agreement"), dated August 15, 2018.  *See* Ex. 1, C-Check Agt. (Doc. No. 264-1).[3]  The C-Check Agreement

---

[2] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to Kent Aviation as the nonmovant.

[3] All exhibit references are to the Exhibits submitted by DFJ-W with its Motion (Doc. No. 264), unless noted otherwise.

is identified as "PROPOSAL NCQ18-00542, Rev: 2." *Id.* at 1. A C-Check is a comprehensive inspection that also includes diagnosing any problems, known as "discrepancies," and performing repairs. Ex. 2, McDevitt Aff. (Doc. No. 264-2) at 2.

CJA retained Aeromanagement Inc. ("Aeromanagement"),[4] and specifically Aeromanagement's president, Ennio Staffini, to serve as CJA's representative and monitor the C-Check inspection and any associated discrepancy repairs. *See* Ex. 6, Staffini Aff. at 2. Mr. Staffini was responsible for reviewing and approving DFJ-W's invoices for work performed on the Aircraft on behalf of CJA. *See id.*; Ex. 4, Staffini Dep. (Doc. No. 264-4) at 290:5-291:17. The C-Check Agreement does not reference Kent Aviation in any way. *See* Ex. 1, C-Check Agt. The cover page of the C-Check Agreement lists Ennio Staffini as the representative for CJA. *See id.* at 1.

The second page of the C-Check Agreement contains a "Pricing Summary" and states that "[s]ummary prices are subject to change depending upon your acceptance of individual line items within the work scope and agreed to in writing." *Id.* at 2. The Pricing Summary identified a total charge of $142,040.00, all of which is categorized as the "Airframe" price subtotal. *See id.* The Pricing Summary excludes "all work scope items identified as Optional Item or *As Required* on the [C-Check Agreement]." *Id.* There do not appear to be any "Optional Items" identified in the C-Check Agreement.

Within the $142,040 "Airframe" subtotal, the AWPA sets forth the charges by line item. *See id.* at 5-8 (line items 1.1 through 1.19). Line items 1.4 through 1.19 each identify

---

[4] CJA had previously retained Aeromanagement to list and market the Aircraft for sale in July 2018. Ex. 6, Staffini Aff. (Doc. No. 264-6) at 2.

task and specify the dollar amount charged for "Labor" for that task. For "Material" and

"Services," the amount is stated to be "As required."  *Id.*[5]

Section VI of the C-Check Agreement is titled "Maintenance Conditions."  *See id.*

at 10.  Section VI.2 provides as follows:

> Any discrepancies, corrosion repair, or other maintenance found as a result
> of the work scope will be worked on a firm fixed price or time and materials
> basis.  Both require prior customer approval and could impact the downtime
> of the aircraft.  Corrosion and aircraft repairs beyond Aircraft Maintenance
> Manual (AMM) or Structural Repair Manual (SRM) may require additional
> downtime due to engineering and material procurement.

*Id.*

### B.  *The Aircraft Purchase Agreement and Escrow and Hold Back Agreement*

In September 2018, CJA entered into an agreement to sell the Aircraft to Kent

Aviation for $2,500,000, pursuant to an Aircraft Purchase Agreement ("APA") dated

September 21, 2018.  *See* Ex. 3, APA (Doc. No. 264-3).  CJA is defined as Seller and Kent

Aviation is defined as Purchaser.  *See id.* at 1.

Section 3.2 of the APA provides that "[t]he Aircraft shall be delivered to Purchaser

with a 1C Check, including all other items due up to, and including, the date of delivery,

further described in Exhibit E (the 'Maintenance').  The Maintenance shall be completed

by DAS, in Wilmington, Delaware (the 'Maintenance Facility')."  *Id.* at 4.[6]  Exhibit E to

---

[5] The only other line-item charge is for the category "Other Miscellaneous Charges," with
a subtotal of $0.  *See* Ex. 1, C-Check Agt. at 9.  This category identifies two charges, one
for Miscellaneous Materials Charges and one for Miscellaneous Environmental Charges,
each of which is capped at $2500.  *See id.*

[6] The parties and agreements refer to "C-Check" and "1C-Check" interchangeably.  *See*,
*e.g.*, Resp. (Doc. No. 282) at 18.

the APA is titled "Maintenance Work Scope" and states, "Refer to Dassault Aviation Services Quote No. NCQ18-00542 Rev 2 dated August 15, 2018." *Id.* at 16.[7]

Section 4.1 of the APA is titled "Closing Date" and provides that "[t]he Closing and delivery of title to the Aircraft to Purchaser shall take place on or before three (3) Business Days from and after the completion by the Maintenance Facility of all Maintenance as required pursuant to Sections 3.1, 3.2, and 3.3 above (the 'Closing Date')." *Id.* at 5.

Section 7.5 of the APA is titled "Amendments" and provides that "[t]he provisions of this Agreement may not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by both parties hereto." *Id.* at 9.

Notwithstanding the APA's requirement that the Aircraft be delivered to Kent Aviation with a completed C-Check, CJA and Kent Aviation decided by January 2019 to close the Aircraft sale transaction prior to the completion of that inspection. *See* Ex. 6, Staffini Aff. at 4. To that end, CJA, Kent Aviation, IATS, and Aeromanagement executed an Escrow and Hold Back Agreement, dated January 25, 2019 (the "Escrow and Hold Back Agreement"). *See* Ex. 10, Escrow and Hold Back Agt. (Doc. No. 264-10). The Escrow and Hold Back Agreement defines CJA as Seller, Kent Aviation as Purchaser, and IATS as Escrow Agent, and it describes Aeromanagement as a service provider for CJA and as CJA's trustee for the purpose of registration in the United States. *See id.* at 1.

---

[7] The parties agree that "DAS" and "Dassault Aviation Services" in the APA refer to the same party in interest as Defendant DFJ-W in this litigation. *See* Mot. at 2.

As relevant here, CJA and Kent Aviation agreed in the Escrow and Hold Back Agreement to set aside $1,500,000 of the $2,500,000 purchase amount for the Aircraft as a "holdback" to pay DFJ-W for completion of the C-Check and associated maintenance. *See id.* at 2. Specifically, section 1.2 of the Escrow and Hold Back Agreement provides as follows:

> [CJA], Aeromanagement and [Kent Aviation] hereby agree to close on or about January 31, 2019 and to leave the amount of United States $1,500,000 as a hold-back amount (the "*Hold Back Amount*") that shall be used to either pay all invoices as issued periodically by DAS and sent by Aeromanagement in the name of [CJA] in relation to the work package number 01-46370 or to guarantee final payment and issuance of the final aircraft release documents. The Parties agree and understand that the Escrow Agent shall, upon receipt of the invoice or invoices from Aeromanagement, pay automatically and irrevocably each invoice without further authorization by the Parties. . . . . It is furthermore agreed and understood that [CJA] shall be responsible for all costs that may exceed the Hold Back Amount and shall diligently and promptly pay DAS any balance left over, if any.

*Id.* Any portion of the Escrow and Hold Back Amount remaining after payment of the final invoice was to be sent by the Escrow Agent to CJA. *See id.* at 3.

CJA and Kent Aviation closed the transaction for the sale of the Aircraft on February 6, 2019. Ex. 6, Staffini Aff. at 4. Upon closing, Kent Aviation paid the purchase price to CJA, less the hold back amount placed in escrow and a commission payment to Aeromanagement, and title to the Aircraft was transferred to Kent Aviation by execution of a Warranty Bill of Sale and FAA Bill of Sale. *See id.* at 4-5; Kent Ex. 1, B. Kent Aff. (Doc. No. 282-1) at 5.

### C.  The Prepurchase Evaluation

On September 24, 2018, DFJ-W and Kent Aviation entered into an Aircraft Work Proposal and Agreement for DFJ-W to perform a prepurchase evaluation on the Aircraft prior to the C-Check (the "Prepurchase Evaluation Agreement").  Kent Ex. 31, Prepurchase Evaluation Agt. (Doc. No. 282-31).[8]  A prepurchase evaluation is an inspection performed by an aircraft maintenance facility to assist a purchaser in evaluating an aircraft.  Kent Ex. 49, Dishman Dep. (Doc. No. 282-49) at 43:14-22.  The Pricing Summary in the Prepurchase Evaluation Agreement stated a price of $11,550.  *See* Kent Ex. 31, at 2.

On November 13, 2018, the Aircraft was flown from its base location in Togo, Africa, to DFJ-W's maintenance facility in Wilmington, Delaware.  Ex. 2, McDevitt Aff. at 2.  DFJ-W performed the prepurchase evaluation "within a week of the airplane arriving in Wilmington."  Kent Ex. 10, Abrams Dep. (Doc. No. 282-10) at 327:13-16.  Robert Abrams, a representative of Kent Aviation, testified that he then met with DFJ-W employees to discuss the results of the evaluation, and that DFJ-W "didn't point anything out to us that they felt would preclude us from moving forward" with the purchase of the Aircraft.  *Id.* at 283:1-23.  Mr. Abrams testified that a DFJ-W employee reported that there were "dents on the top of the airplane," that "the engines made power," and that "they didn't find any corrosion on the tail."  *Id.* at 327:17-329:3.

DFJ-W invoiced Kent Aviation $11,550 for the prepurchase evaluation, and Kent Aviation paid the full amount of the invoice.  Kent Ex. 1, B. Kent Aff. at 4.

---

[8] Exhibits submitted by Kent Aviation with its Response (Doc. No. 282) are designated as "Kent. Ex."

### D.  The C-Check and Aircraft Maintenance

On November 14, 2018, the day after the Aircraft arrived in Wilmington, Delaware, Aeromanagement's president Ennio Staffini signed an Aircraft Work Authorization (referred to herein as "AWA" or "November 2018 Authorization") on CJA's behalf.  *See* Ex. 17, AWA (Doc. No. 264-17); Ex. 6, Staffini Aff. at 3-4. The AWA identifies the Aircraft, references "Work Order Number 01-46370," and includes the following authorization: "I hereby authorize DAS to perform the work and services identified on the Work Order referenced above.  I agree that the work will be performed in accordance with the information provided on such Work Order and the Terms and Conditions on the following page."  *Id.*  at 1.[9]  The Aircraft Work Authorization does not contain any substantive information about the scope of work or cost estimates.  *See id.*

For any repair resulting from the C-Check inspection, DFJ-W provides a "squawk" to the customer explaining the discrepancy discovered and the next steps for resolution of the discrepancy.  Ex. 8, Dishman Aff. (Doc. No. 264-8) at 2.  DFJ-W sent invoices for repairs to the Aircraft to Mr. Staffini.  *See id.*  DFJ-W states generally that CJA, through Mr. Staffini, approved repairs and invoices issued by DFJ-W.  *See id.*

In January 2019, DFJ-W determined that there was significant corrosion on the Aircraft.  *See* Ex. 6, Staffini Aff. at 4.  On January 10, 2019, DFJ-W Project Manager Cleveland Turner advised Mr. Staffini that the wings of the Aircraft would need to be

---

[9] The term "Work Order" is not otherwise defined, and it is unclear if this refers to a separate document.  There does not appear to be a separate "Work Order" document in the record before the Court, and DFJ-W does not cite to or discuss a "Work Order" document.

removed to inspect for corrosion. *Id.* Mr. Staffini states that he informed his contact at CJA, Hervé Dossou, on the same day (January 10, 2019) about the removal of the wings of the Aircraft. *See id.* Mr. Abrams, Kent Aviation's representative, testified that he was aware "on or around" January 10, 2019, that the wings would need to be removed to address corrosion. *See* Ex. 5, Abrams Dep. at 160:10-21. DFJ-W generated a repair estimate for the removal of the wings and repair of known corrosion (the "Corrosion Estimate"). *See* Ex. 9, Corrosion Estimate (Doc. No. 264-9). The Corrosion Estimate, which is not dated,[10] states an estimated cost of repair, including engineering, labor, and materials, of $1,304,720.00. *See id.* at 2.

In June 2019, after the wings had been removed from the Aircraft, DFJ-W determined that "the majority of the wing bolts are defective per the [Aircraft Maintenance Manual], which will cost significant dollars." Kent Ex. 44, McDevitt E-mail (Doc. No. 282-44). The wing bolts can be damaged when removing or re-attaching the wings of an aircraft. *See* Kent Ex. 49, Dishman Dep. (Doc. No. 282-49) at 118:4-7. It is undisputed that DFJ-W removed the wings of the Aircraft and removed wing bolts during that process. *See* Resp. at 29; Kent Ex. 44, McDevitt E-mail at 2. Kent Aviation and DFJ-W disagree, however, as to whether DFJ-W caused damage to the wing bolts while performing maintenance to the Aircraft in 2019. *See* Resp. at 47; Reply (Doc. No. 287) at 10.

By approximately July and August 2019, a dispute arose between CJA and DFJ-W regarding the scope and cost of the ongoing maintenance work on the Aircraft. *See* Ex. 6,

---

[10] In its Motion, DFJ-W states without citation to supporting evidence that it provided the Corrosion Estimate to CJA on January 31, 2019. *See* Mot. at 10.

Staffini Aff. at 5; *see also* Exs. 11 (Doc. No. 264-11), 12 (Doc. No. 264-12). Around that same time, CJA revoked Mr. Staffini's authorization to approve any additional repairs or payments. *See* Ex. 6, Staffini Aff. at 5. By August 2019, CJA halted the repair project, and the Escrow Agent made no further payments to DFJ-W under the Escrow and Hold Back Agreement. *See id.* DFJ-W then ceased repair work on the Aircraft. *See id.*; Ex. 2, McDevitt Aff. at 2. The Aircraft remains presently in storage at DFJ-W's maintenance facility in Delaware. *See id.* at 2. At the time the Aircraft repair project was halted, there was $520,000 in hold back funds remaining in the custody of the Escrow Agent. *See* Ex. 6, Staffini Aff., at 5.[11]

According to DFJ-W, the "current job cost total" owed by CJA to DFJ-W is $2,463,816.37. Ex. 8, Dishman Aff. at 2-3. DFJ-W has received $1,311,861 in payments from CJA for work performed on the Aircraft. *See id.* This payment total includes three payments disbursed by the Escrow Agent from the Hold Back Amount, totaling $980,000. *See id.*

   *E. The Improvements Agreement*

In February 2019, a day after the sale transaction closing and while the Aircraft was undergoing C-Check maintenance, DFJ-W and Kent Aviation entered into an Aircraft Work Proposal and Agreement, dated February 7, 2019, for upgrades and improvements to be made to the Aircraft while it was already "opened up" for the C-Check. *See* Kent Ex.

---

[11] IATS interpleaded $516,000 in remaining hold back funds into the Court's registry, retaining $4,000 for payment of its attorney's fees upon its discharge from this litigation. *See* Order of Apr. 8, 2021 (Doc. No. 59).

9, Improvements Agt. (Doc. No. 282-9); Kent Ex. 1, B. Kent Aff. at 4-5.  DFJ-W thereafter issued an invoice for $200,000 as a progress payment under the Improvements Agreement, which Kent Aviation paid.  *See* Kent Ex. 1, B. Kent Aff. at 5.

DFJ-W ceased work on the Aircraft under the Improvements Agreement in August 2019, at the same time it ceased work under the C-Check Agreement.  *See* Mot. at 13; Ex. 6, Staffini Aff. at 5.

III.  DISCUSSION

A.  *Breach of Contract Claims*

Kent Aviation asserts claims for breach of contract against DFJ-W as to the August 15, 2018 AWPA, *see* Ex. 1, which the Court refers to herein as the C-Check Agreement, and as to the February 7, 2019 AWPA, *see* Kent Ex. 9, which the Court refers to herein as the Improvements Agreement.  DFJ-W moves for summary judgment on both claims.  *See* Mot. at 15-19.

1.  *Breach of the C-Check Agreement*

DFJ-W seeks summary judgment on Kent Aviation's claim for breach of the C-Check Agreement on the basis that Kent Aviation is not a party to this contract and therefore does not have standing to assert a claim for breach.  *See* Mot. at 17-18.  It is undisputed that Kent Aviation is not a party to the C-Check Agreement, which was executed by DFJ-W and CJA.  *See* Ex. 1, C-Check Agt. at 1, 4.  Kent Aviation argues, however, that it may enforce the C-Check Agreement as a third-party beneficiary.

As a threshold matter, the Court must determine the applicable law for this claim. DFJ-W states, without citation, that the C-Check Agreement provides that it shall be

interpreted "in accordance with the laws of the state where the services were performed." Mot. at 17. The Court is unable to locate any such choice-of-law provision in the C-Check Agreement itself. Kent Aviation states that the C-Check Agreement "specifically provide[s] for the application of Delaware law in the event of any dispute." Resp. at 31. But the choice-of-law provision cited and apparently relied on by Kent Aviation is in the Prepurchase Evaluation Agreement. *See id.*; Ex. 8, Prepurchase Eval. Agt. (Doc. No. 282-8) at 13. Kent Aviation does not point the Court to any similar provision in the C-Check Agreement or explain the applicability of a provision from a different contract.

Oklahoma's choice-of-law rules for contract claims, which this Court applies in diversity actions, prescribe that a contract shall be interpreted in accordance with the law of the place where it is performed. *See* Okla. Stat. tit. 15, § 162 ("A contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."); *Gerson v. Logan River Acad.*, 20 F.4th 1263, 1270 (10th Cir. 2021) ("When exercising diversity jurisdiction under 28 U.S.C. § 1332, a district court ordinarily applies the choice-of-law rules of the State in which it sits."). It is undisputed that the C-Check Agreement provides for the performance of services on the Aircraft at DFJ-W's maintenance facility in Wilmington, Delaware. The Court therefore concludes that Delaware law applies to this claim.

Under Delaware law, "[a] third-party beneficiary is an individual who is not a party to a contract but can nevertheless enforce it under certain circumstances." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022) (alteration and internal quotation marks

omitted).  "To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract."  *Id.* (internal quotation marks omitted).

Kent Aviation argues that "it was the express intention of CJA to secure performance by [DFJ-W] of the promised act (i.e., completion of the C-Check and all required maintenance related thereto) in satisfaction of a pre-existing obligation owed to Kent to do so under the APA."  Resp. at 34.  It is undisputed, however, that the APA—i.e., the agreement for CJA to sell the Aircraft to Kent Aviation—was executed more than a month after the C-Check Agreement was executed.  *See* Ex. 1, C-Check Agt. (dated Aug. 15, 2018); Ex. 3, APA (dated Sept. 21, 2018).  It is therefore not reasonable to interpret the C-Check Agreement as creating a benefit for Kent Aviation as a third party "in satisfaction of a pre-existing obligation" under the APA.  *See Bako*, 288 A.3d at 271.

Accordingly, Kent Aviation has not pointed the Court to admissible evidence that would be sufficient to allow a reasonable jury to find in its favor on one of the necessary elements it must prove in order to recover as a third-party beneficiary under the C-Check Agreement.  Kent Aviation therefore does not have standing to assert a claim for breach of the C-Check Agreement as a third-party beneficiary of that agreement.  Therefore, DFJ-W's motion for summary judgment on Kent Aviation's claim for breach of the C-Check Agreement is GRANTED.

### 2. *Breach of the Improvements Agreement*

DFJ-W moves for summary judgment on Kent Aviation's claim for breach of the Improvements Agreement. *See* Mot. at 18-19.

Regarding choice of law, the Court finds that Delaware law governs the Improvements Agreement. Although Kent Aviation states that the Improvements Agreement "specifically provide[s] for the application of Delaware law in the event of any dispute," the Court is again unable to locate any such provision in that agreement.[12] Nevertheless, it is undisputed that the Improvements Agreement provides for the performance of services on the Aircraft at DFJ-W's maintenance facility in Wilmington, Delaware. Applying Oklahoma's choice-of-law rules, the Court therefore concludes that Delaware law applies to this claim. *See* Okla. Stat. tit. 15, § 162; *Gerson*, 20 F.4th at 1270.

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs." *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011). It is undisputed that the Improvements Agreement is a valid and enforceable contract between DFJ-W and Kent Aviation, and it is undisputed that DFJ-W ceased performance of work under the Improvements Agreement in August 2019, at the same time it halted work under the C-Check Agreement for CJA.

DFJ-W argues that it did not breach the Improvements Agreement, despite not completing the work it was obligated to perform under the Agreement, citing an

---

[12] DFJ-W does not address choice of law for this claim.

"Excusable Delay" clause in an Aircraft Work Authorization signed by Mr. Staffini on November 14, 2018 (the "November 2018 Authorization"). *See* Mot. at 18. That provision states:

> [DFJ-W] shall not be considered in default hereunder and no liability is assumed by [DFJ-W] for any change in delivery schedule due to any cause not reasonably within the control of [DFJ-W] including, but not limited to fire, explosion, riot, acts of God, civil disturbances, floods, earthquakes, and casualties similar in nature to the foregoing, or delay caused by vendors or suppliers of [DFJ-W].

Ex. 17, AWA at 3. Mr. Staffini, however, represented CJA in signing the November 2018 Authorization, and DFJ-W does not point to any similar acceptance of the Excusable Delay provision by Kent Aviation. *See* Ex. 6, Staffini Aff. at 3-4 (Mr. Staffini stating that he executed the November 2018 Authorization "on behalf of [CJA]"). DFJ-W further makes no attempt to explain how the terms and conditions of the November 2018 Authorization relate in any way to the February 2019 Improvements Agreement.

Accordingly, the Court concludes that DFJ-W has failed to demonstrate that it is entitled to summary judgment on Kent Aviation's claim for breach of the Improvements Agreement. DFJ-W's motion for summary judgment on Kent Aviation's claim for breach of the Improvements Agreement is DENIED.

### B. Tort Claims

DFJ-W further moves for summary judgment on Kent Aviation's claims for tortious interference with existing contract, fraud by nondisclosure, negligence, and negligence per se. *See* Mot. at 19-25.

As a threshold matter, the Court again must determine which state's law applies to consideration of these claims.  DFJ-W does not engage in a choice-of-law analysis but relies on Oklahoma law when discussing Kent Aviation's tort claims.  *See id.*   Kent Aviation argues that Delaware law applies to its tort claims.  *See* Resp. at 36-37.

This Court again applies Oklahoma's choice-of-law rules.  *See Gerson*, 20 F.4th at 1270.  "Under Oklahoma's choice-of-law rules, 'the rights and liabilities of parties with respect to a particular issue in tort should be determined by the law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties.'"  *Cagle v. James St. Grp.*, 400 F. App'x 348, 357 (10th Cir. 2010) (quoting *Hightower v. Kan. City. S. Ry. Co.*, 70 P.3d 835, 842 (Okla. 2003)).  "This test . . . requires the consideration of four factors 'according to their relative importance with respect to a particular issue as follows: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred.'"  *Id.* (quoting *Hightower*, 70 P.3d at 842).

None of Kent Aviation's tort claims has any relationship to Oklahoma.[13]  The only two states that have a relationship to these tort claims are Texas, the state in which Kent Aviation is incorporated and has its principal place of business, and Delaware, the state in which DFJ-W is incorporated and has its principal place of business, as well as the state in

---

[13] IATS originally filed this action in Oklahoma state court as an interpleader action pursuant to Oklahoma statute, in its capacity as escrow agent under the Escrow and Hold Back Agreement.  *See* Pet. (Doc. No. 1-1) at 1.  DFJ-W removed this action to this Court under diversity jurisdiction.  *See* Notice of Removal (Doc. No. 1) at 1, 3.

which work was performed on the Aircraft.  *See* Resp. at 37.  CJA, to the extent it is relevant to any of the tort claims here, is a foreign entity, organized under the laws of the Isle of Man.  *See* CJA Cross-Cls. (Doc. No. 61) at 20.

Upon consideration of the factors in Oklahoma's choice-of-law test for tort claims, the Court concludes that Delaware has the most significant relationship to the occurrences underlying Kent Aviation's tort claims.  All of the tort claims under consideration here are squarely focused on the conduct of DFJ-W in Delaware, and Delaware is generally the place where the alleged injuries occurred, all of which flow from asserted failures by DFJ-W in relation to the Aircraft while it was located at DFJ-W's maintenance facility in Wilmington, Delaware.  The Court will therefore apply Delaware law to Kent Aviation's tort claims.

### 1.  *Tortious Interference with Existing Contract*

"Under Delaware law, the elements of a claim for tortious interference with a contract are: (1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."  *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (emphasis and internal quotation marks omitted).

Kent Aviation claims that DFJ-W tortiously interfered with the APA by making "materially misleading statements to CJA about the cost of the C-Check that were a significant factor in CJA ultimately breaching the APA with Kent [Aviation]."  *See* Resp. at 40.  DFJ-W argues that it cannot be liable for tortiously interfering with the APA because

Kent Aviation and CJA performed under the APA and completed the sale transaction.  *See* Mot. at 19-20.

The APA, dated September 21, 2018, provided: "For and in consideration of the Purchase Price, on the Closing Date, Seller shall sell and deliver to Purchaser, and Purchaser shall purchase and accept delivery from Seller of, the Aircraft on the terms and conditions set forth herein."  Ex. 3, APA at 4.  The Seller here is CJA, the Purchaser is Kent Aviation, the Purchase Price is $2,500,000, and the Closing Date was set to occur after completion of the C-Check and delivery of the Aircraft to Kent Aviation in airworthy condition.  *See id.* at 2-5.

CJA and Kent Aviation subsequently decided to modify the terms of the sale transaction to close before the completion of the C-Check and associated repairs.[14]  CJA and Kent Aviation executed a second agreement, the Escrow and Hold Back Agreement, dated January 25, 2019, which provided that "[CJA], Aeromanagement, and [Kent Aviation] hereby agree to close on or about January 31, 2019 and to leave the amount of [$1.5 million] as a hold-back amount," which was to be used to pay DFJ-W invoices for remaining work on the Aircraft after closing.  Ex. 10, Escrow and Hold Back Agt. at 2.  It is undisputed that CJA and Kent Aviation closed the sale transaction on February 6, 2019, at which time Kent Aviation paid the purchase price to CJA, less the hold back amount placed in escrow and less a commission payment to Aeromanagement, and title to the

---

[14] The APA permits modification by written agreement, providing that "[t]he provisions of this Agreement may not be waived, altered, modified, amended, supplemented or terminated in any manner except by written instrument signed by both parties hereto."  *Id.* at 9.

Aircraft was transferred to Kent Aviation by execution of a Warranty Bill of Sale and FAA Bill of Sale.  *See* Ex. 6, Staffini Aff. at 4-5; Kent Ex. 1, B. Kent Aff. at 5.

Based on these undisputed facts, the Court finds that CJA and Kent Aviation fully performed their obligations under the APA.  The Court therefore cannot conclude that any conduct by DFJ-W resulted in a breach of the APA, a necessary element of Kent Aviation's claim.

In addition, Kent Aviation appears to suggest that DFJ-W caused CJA to breach the Escrow and Hold Back Agreement by causing CJA to withhold approval for payments from the hold back funds, months after the transaction closed.  But Kent Aviation does not discuss any specific terms or obligations under the Escrow and Hold Back Agreement that CJA may have breached, express or implied, or otherwise meaningfully explain a theory of breach here as to the Escrow and Hold Back Agreement.

The Court therefore concludes that Kent Aviation has not cited to evidence sufficient to allow a reasonable jury to find in its favor on its claim for tortious interference of contract.  *See Bhole*, 67 A.3d at 453.  Accordingly, the Court concludes that DFJ-W is entitled to summary judgment on Kent Aviation's claim for tortious interference of contract, and DFJ-W's motion for summary judgment on this claim is GRANTED.

### 2. *Fraud by Nondisclosure*

The elements of common law fraud under Delaware law are: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's

action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). The Delaware Supreme Court recognizes that "fraud does not consist merely of overt misrepresentations." *Id.* Fraud "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Id.* "[O]ne is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading." *Id.*

DFJ-W argues that there are no facts in the record to support Kent Aviation's contention that DFJ-W owed Kent Aviation a duty to disclose information and failed to do so. *See* Mot. at 20-21; Reply at 6-9.

Kent Aviation argues, as a threshold matter, that summary judgment is inappropriate on this claim because DFJ-W does not specifically address each of five general duties alleged in Kent Aviation's cross-claim pleading. *See* Resp. at 42-43. The Court disagrees that this alone is a ground to deny DFJ-W's summary judgment. "[T]he nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 466 U.S. at 324). Thus, in responding to DFJ-W's Motion, Kent Aviation may not merely point to general theories of duty but must—as set forth in Rule 56—cite sufficient admissible evidence to show that there is a genuine question of material fact as to any challenged element of its claim.

Kent Aviation sets forth four factual instances in its Response for which it argues that DFJ-W is liable for fraud by nondisclosure.  The Court will address each in turn.

*a.  The Prepurchase Evaluation*

Kent Aviation first argues that DFJ-W had a duty to disclose the condition of the Aircraft when it performed a prepurchase evaluation pursuant to the Prepurchase Evaluation Agreement.  While it is undisputed that the Prepurchase Evaluation Agreement is a valid contract, Kent Aviation is not asserting a claim for breach of contract here.  Nor does Kent Aviation cite to any relevant legal authority to establish that DFJ-W is liable in tort for fraud for failing to perform its obligations under the Prepurchase Evaluation Agreement, namely to evaluate the Aircraft and disclose the results.

"In preventing gratuitous 'bootstrapping' of contract claims into tort claims, courts recognize that a breach of contract will not generally constitute a tort."  *Data Mgmt. Internationalé, Inc. v. Saraga*, No. 05C-05-108, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007); *see also Talley v. Christiana Care Health Sys.*, No. 17-926, 2019 WL 668272, at *4 (D. Del. Feb. 19, 2019) (applying the "bootstrapping doctrine" set forth in *Data Management*); *Del. State Univ. Student Housing Found. v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 377 (D. Del. 2008) (same).  "Even an intentional, knowing, wanton, or malicious action by the defendant will not support a tort claim if the plaintiff cannot assert wrongful conduct beyond the breach of contract itself."  *Data Mgmt*., 2007 WL 2142848, at *3.  "Thus, in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty

imposed by contract." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (citing *Data Mgmt.*, 2007 WL 2142848, at *3).

The Court determines that Kent Aviation's fraud by nondisclosure claim here arises solely from the contractual undertakings in the Prepurchase Evaluation Agreement. Based on the record presented, even assuming that DFJ-W failed to disclose some material condition of the Aircraft at the time of the prepurchase evaluation, Kent Aviation cannot establish that DFJ-W violated any duty that is independent of one prescribed by the Prepurchase Evaluation Agreement.

### b. The C-Check

Kent Aviation next argues that DFJ-W concealed its internal calculations as the estimated cost of repairs during the inspection phase of the C-Check. In support of this argument, Kent Aviation asserts that "[i]n December 2018, Dassault told CJA, when the inspection phase of the C-Check was 95% complete, that the total cost for repairs would be $1,000,000 to $1,300,000." Resp. at 45. Kent Aviation further asserts that "[o]n January 23, 2019, Dassault estimated for CJA that the costs of repairs would be approximately $900,000, $300,000 of which had already been paid." *Id.* Kent Aviation claims that these are false statements because DFJ-W was simultaneously maintaining an internal estimate of repair costs that was approximately three times greater than the numbers provided to CJA. *See id.*

As an initial matter, the record does not support Kent Aviation's description of either of the two affirmative statements it identifies as fraudulent. First, Kent Aviation's assertion that "Dassault told CJA . . . the total cost for repairs would be $1,000,000 to

$1,300,000" in December 2018 is a misstatement of the record.  Kent Aviation relies here

on an email sent by Mr. Staffini, president of Aeromanagement, to Hervé Dossou, acting

managing director of CJA, dated December 21, 2018.  Kent Ex. 37, Staffini E-mail.

Discussing a progress update email from DFJ-W lower in the thread, Mr. Staffini writes,

"[r]ight now MyDAS is at $521,000 without the gear, the tanks, and the windows, so I

assume that barring any additional large repair, we may end up between $1M and $1.3M."

*Id.* at 2.[15]  In this statement, Mr. Staffini, acting as CJA's representative and communicating

with an officer of CJA, opines on what the total cost of the repair might be based on what

he has seen in DFJ-W's project updates through that point in time, and qualifies that

opinion by stating it is made "barring any additional large repair."[16]  This is not evidence

of any estimate or statement made by DFJ-W in December 2018, and it does not reasonably

support the proposition that DFJ-W made a false statement in December 2018.

Second, Kent Aviation's assertion that DFJ-W on January 29, 2019 "estimated for

CJA that the costs of repairs would be approximately $900,000" similarly overstates what

is supported by the record.  Resp. at 45.  As support for this assertion, Kent Aviation cites

its AMF (Additional Material Facts) Nos. 20-22.  *See* Resp. at 17-31, 45.  In AMF Nos. 20

and 21, Kent Aviation discusses DFJ-W's MyDAS software and states that all estimates of

repair costs "should be reflected on a written Proforma estimate" produced through that

---

[15] MyDAS is a digital system DFJ-W uses to provide information to customers.  *See* Resp.
at 22-23.

[16] *See also* Kent Aviation Am. Cross-Cls. at 12 ("Aeromanagement estimated that the final
C-Check price would total between $1,000,000.00 and $1,300,000.00.").

software.  *Id.* at 22-23.  In AMF No. 22, Kent Aviation states that "[o]n January 23, 2019, Dassault issued a Proforma invoice for the repair of the discrepancies identified during the 'inspection' portion of the C-Check in the total amount of $914,733.33, of which $331,861.00 had already been paid. (Ex. 16, January 2019 ProForma Invoice)."  *Id.* at 23. From these facts, Kent Aviation represents that DFJ-W "estimated for CJA" a total repair bill of "approximately $900,000."  The argument that the $914,733.33 may be read as a complete estimate of all repair costs is not plausible.  When that amount is viewed as an invoiced amount for work already performed during the inspection phase of the C-Check and not as an estimate, there is no factual basis to conclude that DFJ-W presented a low estimate to CJA while secretly concealing a higher estimate to induce CJA (or anyone else) to do something it otherwise would not have done.

Beyond these two asserted affirmative misrepresentations, Kent Aviation asserts that DFJ-W personnel had "estimated it would cost more than $3,000,000 to repair the discrepancies identified during the 'inspection' portion of the C-Check."  *Id.* at 24; *see id.* at 45.  Kent Aviation fails to explain how DFJ-W had a duty to apprise Kent Aviation as to this estimate in December 2018 or January 2019.  Kent Aviation appears to be claiming instead that DFJ-W made an affirmative misstatement to CJA during the course of the C-Check, which was being performed pursuant to an agreement between DFJ-W and CJA. Absent supporting argument and authority, the Court cannot properly find that DFJ-W had a legal duty to disclose information about the C-Check to Kent Aviation in this regard.

In accordance with the foregoing, the Court finds no merit to Kent Aviation's argument here regarding any form of fraud committed by DFJ-W with respect to the C-Check on the Aircraft in December 2018 or January 2019.

### c. The Service Life of the Aircraft

Kent Aviation next argues that DFJ-W "also failed to share that the repairs would significantly degrade the service life and safety margin of the Aircraft, to the point where it would be unairworthy." Resp. at 46. Kent Aviation fails to provide any meaningful discussion of this claim, however. Kent Aviation does not cite any support for any contention that DFJ-W knew when repairs were made that the repairs would affect the service life and safety margins of the Aircraft, address the source of any duty to disclose in relation to this argument, or show that the potential effect of a specific repair was not disclosed to the extent required. The Court accordingly finds no merit to Kent Aviation's argument.

### d. DFJ-W's Mechanic's Lien

Lastly, Kent Aviation argues that DFJ-W failed to "publicly disclose its security interest on the Aircraft by filing it with the FAA." Resp. at 46. Specifically, Kent Aviation argues that 49 U.S.C. § 44107 required DFJ-W to record its lien with the Federal Aviation Administration ("FAA"). This statute provides, in part: "(a) Establishment of a system. – The Administrator of the [FAA] shall establish a system for recording–(1) conveyances that affect an interest in civil aircraft of the United States; [and] (2) leases and instruments executed for security purposes, including conditional sales contracts, assignments, and amendments . . . ." 49 U.S.C. § 44107(a)(1)-(2).

DFJ-W does not claim here that it executed a conveyance or "lease [or] instrument executed for security purposes." *Id.* DFJ-W is instead claiming that it has a right to assert a mechanic's lien on the Aircraft while the Aircraft is held in its custody by operation of Delaware statute, pursuant to title 25, section 3901(a) of the Delaware Code. *See* Mot. at 20. The Court therefore finds that 49 U.S.C. § 44107 has no bearing on DFJ-W's asserted lien here,[17] and that failure to comply with this statute cannot form the basis of a claim for fraud by nondisclosure.

### e. Fraud by Nondisclosure Conclusion

In accordance with the foregoing discussion, the Court concludes that Kent Aviation has failed to present sufficient admissible evidence to show that a jury could reasonably find in its favor on its claim against DFJ-W for fraud by nondisclosure. DFJ-W's motion for summary judgment on Kent Aviation's fraud by nondisclosure claim is therefore GRANTED.

### 3. Negligence

Under Delaware law, "[i]n order to establish a negligence claim, a plaintiff must establish that defendant owed plaintiff a duty of care; defendant breached that duty; and defendant's breach was the proximate cause of plaintiff's injury." *Pipher v. Parsell*, 930 A.2d 890, 892 (Del. 2007) (internal quotation marks omitted).

---

[17] The Court notes, moreover, that 49 U.S.C. § 44107 directs the FAA to implement a system of recordation, and it does not prescribe any rules or obligations for recordation that apply to the public.

DFJ-W argues that Kent Aviation is asserting a negligent breach of contract, which is not a cognizable claim for relief. *See* Mot. at 22. Kent Aviation argues in its Response that its negligence claim is premised on its claim that DFJ-W violated a duty of care by scratching the wing bolts when removing the wings from the Aircraft, resulting in permanent damage to the bolts. *See* Resp. at 47.

"As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." *Pinkert v. John J. Olivieri, P.A.*, No. CIV. A. 99-380, 2001 WL 641737, at *5 (D. Del. May 24, 2001). "[A] tort usually involves violation of a duty which arises by operation of law and not by the mere agreement of the parties." *Data Mgmt.*, 2007 WL 2142848, at *3 (internal quotation marks omitted). "[T]he same circumstances," however, "may give rise to both breach of contract and tort claims if the plaintiff asserts that the alleged contractual breach was accompanied by the breach of an independent duty imposed by law." *Id.*

The Court finds that Kent Aviation sufficiently raises a cognizable negligence claim. DFJ-W, as the operator of a maintenance facility, has an independent legal duty, separate from its contractual undertakings, to perform maintenance in a generally reasonable manner. *See Delmarva Power & Light Co. v. Burrows*, 435 A.2d 716, 718 (Del. 1981) ("Delaware law measures duties owed in terms of reasonableness. One's duty is to act reasonably, as a reasonably prudent man (or entity) would."). And there is a genuine issue of fact as to whether DFJ-W failed to perform the maintenance on the Aircraft in a generally reasonable manner by damaging the wing bolts.

28

DFJ-W argues, though, that it did not owe any duty to Kent Aviation.  *See* Mot. at 22-23.  The Court disagrees.  As discussed above, the Aircraft purchase transaction closed on February 6, 2019, at which time Kent Aviation became the title holder of the Aircraft.  DFJ-W does not contest that it owes a duty of care to the owner of the property being repaired.  *See* Mot. at 23.  While neither party provides a specific date for when the wings were removed from the Aircraft in their papers, the record indicates it occurred after Kent Aviation took title to the Aircraft.  *See* Mot. at 10 (DFJ-W asserts that it sent CJA an estimate for the cost to remove the wings on January 31, 2019); *see also* Kent Aviation Am. Cross-Cls. at 15 (alleging that "DFJ removed the Aircraft's wings in approximately late-April/mid-May of 2019"); DFJ-W Answer (Doc. No. 71) (admitting this allegation).  This is sufficient, for the purpose of this Motion, to determine that summary judgment is inappropriate here and that Kent Aviation may assert this claim at trial.  DFJ-W's request for summary judgment on Kent Aviation's negligence claim is DENIED.

### 4.  *Negligence Per Se*

"It has been long settled in this State that the violation of a statute or ordinance enacted for the safety of others is negligence in law or negligence per se."  *Sammons v. Ridgeway*, 293 A.2d 547, 549 (Del. 1972).  DFJ-W argues that it is entitled to judgment as a matter of law on Kent Aviation's negligence per se claim because Kent Aviation cannot show a violation of any statute or regulation.  Kent Aviation argues in response that "[t]he regulation and corresponding statutes cited above were enacted by the FAA for the safety of Aircraft operators, passengers, and the population at large."  Resp. at 48.

Kent Aviation does not cite to any federal regulations in its Response brief, however, and cites to only one federal statute pertaining in any way to the FAA, 49 U.S.C. § 44107, which as discussed above relates to directing the FAA to establish a system for the recordation of conveyances and security instruments for aircraft. Even if Kent Aviation had shown a violation of 49 U.S.C. § 44107, the Court cannot view this statute as one "enacted for the safety of others." *Sammons*, 293 A.2d at 549. More pointedly, Kent Aviation does not mention a single act done by DFJ-W on which negligence per se liability could, even in theory, be premised. Kent Aviation simply refers to an unidentified "violation." *See* Resp. at 48.

To defeat summary judgment and maintain a claim for negligence per se at this stage, Kent Aviation must at minimum show that DFJ-W engaged in some kind of conduct that violated a statute or regulation enacted to protect public safety. Kent Aviation wholly fails to make any such showing here. Accordingly, DFJ-W's motion for summary judgment on Kent Aviation's negligence per se claim is GRANTED.

*C. Attorney Fees*

DFJ-W moves for attorney's fees under title 12, section 940(A) of the Oklahoma Statutes. This request is DENIED as premature. DFJ-W may renew its motion for attorneys' fees, to the extent applicable, after entry of judgment. *See* Fed. R. Civ. P. 54(d)(1)-(2).

CONCLUSION

As outlined above, Defendant Dassault Falcon Jet-Wilmington Corp.'s Motion for Summary Judgment Against Kent Aviation, LLC (Doc. No. 264) is GRANTED IN PART AND DENIED IN PART.

Specifically, the Court GRANTS the Motion as to Kent Aviation, LLC's claims for breach of contract of the C-Check Agreement, tortious interference of contract, fraud by nondisclosure, and negligence per se.  The Court DENIES the Motion as to Kent Aviation, LLC's claims for breach of contract of the Improvements Agreement and for negligence.

IT IS SO ORDERED this 12th day of June, 2023.

CHARLES B. GOODWIN
United States District Judge